1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

9

UNITED STATES OF AMERICA,

Plaintiff,

vs.

RAFAEL LOPEZ-ONTIVEROS (1),
MARGARITO ONTIVEROS (12),

Defendants.

10
11
12
13
14
15

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 15-CR-0575-GPC

**ORDER DENYING DEFENDANTS'
MOTIONS TO SUPPRESS
WIRETAP EVIDENCE**

[ECF Nos. 209, 231.]

16
17
18
19
20

Defendants Rafael LOPEZ-ONTIVEROS (hereinafter referred to as "LOPEZ-ONTIVEROS") and Margarito ONTIVEROS (referred to as "M. ONTIVEROS") move to suppress wiretap evidence that was obtained during a federal drug investigation. Def. Mots., ECF Nos. 209, 231. The United States has opposed. Gov't Opp., ECF Nos. 238 and 241. A hearing was held on February 1,

2017.  M. ONTIVEROS provided further briefing on February 8, 2017, ECF. No. 257, and LOPEZ-ONTIVEROS filed a supplemental opposition on February 15, 2017.  ECF No.  261.  Upon consideration of the moving papers, applicable law and argument of counsel, and for the reasons set forth below, the Court hereby **DENIES** the motions to suppress wiretap evidence.

### A. Procedural History

On March 4, 2015, LOPEZ-ONTIVEROS was indicted along with Jose Espinoza on charges of conspiracy to distribute methamphetamine.  On July 14, 2016, a Second Superseding Indictment was returned by the grand jury charging 13 defendants, including LOPEZ-ONTIVEROS and M. ONTIVEROS (collectively "Defendants"), with conspiracy to distribute of methamphetamine.  Defendants have entered not guilty pleas to the second superseding indictment.

### B. Overview of the Investigation

This case arises out of a two-year Drug Enforcement Administration ("DEA") investigation into the alleged drug trafficking activities of the LOPEZ-ONTIVEROS drug trafficking organization ("LOPEZ-ONTIVEROS DTO").  The investigation commenced in September 2013 following LOPEZ-ONTIVEROS' release from prison after serving a two-year sentence for methamphetamine trafficking.  In September 2013, a confidential source ("CS-1") provided DEA agents information regarding LOPEZ-ONTIVEROS' drug trafficking activities.

Thereafter, the DEA initiated an undercover investigation of LOPEZ-ONTIVEROS which commenced with controlled purchases of methamphetamine, and then utilized pen registers, surveillance, GPS trackers, and administrative subpoenas before seeking the use of wiretaps approximately 9 months later.

The initial wiretap application for Target Telephone 1 ("TT-1") was presented on June 2, 2014 and was based on the affidavit of DEA Special Agent Jacobsen.  The affiant identified the Target Subjects, including LOPEZ-ONTIVEROS and M. ONTIVEROS, the crimes being investigated, and the goals of the investigation.  The goals of the investigation included identifying the manner and means that the predicate offenses were being committed, methods of operation of the DTO, the identities and roles of participants, and the location of facilities used to store narcotics.  ECF No. 238-1, June 2, 2014 Affidavit ¶ 11 (hereinafter referred to as "AFF-1").  To establish necessity for the wiretap order, Agent Jacobsen identified the investigative techniques that had been used and the results of their use, and explained why other techniques were not used.  AFF-1 ¶¶ 47-109.  Upon review of the application and supporting affidavit, U.S. District Judge William Q. Hayes authorized the wiretap interception. Wire interceptions over TT-1 began on June 4 and ceased on June 18, 2014.  AFF-2 ¶ 43.  It was later determined that LOPEZ-ONTIVEROS ceased using TT 1 on or about May 25, 2014.  *Id*.

On June 23, 2014, a subsequent wiretap application for interception of Target Telephones 2 and 3 ("TT-2" and "TT-3") was presented by the Government and granted by U.S. District Judge Larry A. Burns.  Thereafter, on July 22, 2014, the government sought and obtained a continued interception order for TT-3, and then on August 12, 2014 obtained an order authorizing the continued interception of TT-3 and the initial interception of TT-4.  Interception of TT-4 was thereafter continued and relied on for additional wiretap orders on Target Telephones 6, 9 and 10 ("TT-6", "TT-9", and "TT-10").

On September 4, 2014, U.S. District Judge John A. Houston approved an order for the continued wire interception of TT-4 and the initial interception of Target Telephones TT-5 and TT-6.  On November 18, 2014, Judge Houston approved the wire interception of Target Telephones 8, 9, and 10.  Each of the orders incorporated by reference each of the earlier affidavits supporting applications for wire interception.

LOPEZ-ONTIVEROS argues that the Government failed to establish necessity for wire interception prior to obtaining an order on TT-1 and moves to suppress wiretap evidence derived from Target Telephones 1, 2, 5, 6, and 8 because they all rely on the affidavit submitted in support of the initial interception of TT-1.  Lopez-Ontiveros Mot. 2.

M. ONTIVEROS alleges that probable cause and necessity to support wire

4

interception for TT-3 were lacking and moves to suppress evidence derived from the interception of calls on Target Telephones 3, 4, 6, 9 and 10 on the basis that all of the orders rely upon the deficient TT-3 affidavit.

### C. Traditional Investigative Techniques Used Prior to Initial TIII Order

#### 1. Confidential Sources

Based on CS-1's information that LOPEZ-ONTIVEROS had resumed his drug trafficking activities after his release from prison, federal agents began an investigation of LOPEZ-ONTIVEROS and employed CS-1 and CS-2 to make three controlled purchases of methamphetamine from LOPEZ-ONTIVEROS and his associates between November 2013 and January 2014.  Prior to the controlled buys, some of the meetings and telephone calls with LOPEZ-ONTIVEROS were recorded and others were not.

#### a.  November 21, 2013 Delivery of 27.4 Grams of Methamphetamine

On October 7, 2013, in an unrecorded meeting, CS-1 met with LOPEZ-ONTIVEROS to discuss the purchase of methamphetamine.  AFF-1 ¶ 20.  At the meeting, LOPEZ-ONTIVEROS provided CS-1 with the telephone number of Julio RODRIGUEZ ("RODRIGUEZ") as the point of contact for all future purchases of methamphetamine.  On October 10, 2013, LOPEZ-ONTIVEROS and CS-1 had another unrecorded meeting where LOPEZ-ONTIVEROS told CS-1 that he had

recently received seven pounds of methamphetamine that was being stored in stash

houses. AFF-1 ¶ 22.  On November 21, 2013, in a recorded call, CS-1 arranged to

meet RODRIGUEZ to purchase methamphetamine.  Later, in a recorded meeting,

RODRIGUEZ delivered 27.4 grams of methamphetamine to CS-1 and CS-2.  AFF-

1 ¶ 24.  During the meeting, CS-1 told RODRIGUEZ that CS-2 wanted to meet

with LOPEZ-ONTIVEROS.  RODRIGUEZ replied that LOPEZ-ONTIVEROS

doesn't want to "deal" with it.  AFF-1 ¶ 25.

### b.  December 4, 2013 Request of CS-2 to Meet with LOPEZ-ONTIVEROS

On December 4, 2013, CS-2 had a recorded meeting with RODRIGUEZ to

discuss a multi-pound transaction and asked about LOPEZ-ONTIVEROS.

RODRIGUEZ replied that he was going to be honest and stated that CS-2 "will

never see" LOPEZ-ONTIVEROS because RODRIGUEZ would distribute drugs at

the direction of LOPEZ-ONTIVEROS. AFF-1 ¶ 26.  RODRIGUEZ also told CS-2

that LOPEZ-ONTIVEROS was affiliated with the Mexican Mafia and that it

provided LOPEZ-ONTIVEROS with protection.  AFF-1 ¶ 27.

### c.  January 28, 2014 Delivery of a Pound of Methamphetamine

On January 13, 2014, in an unrecorded call with CS-1, LOPEZ-

ONTIVEROS arranged to meet with CS-1 to discuss the purchase of a pound of

methamphetamine.  During the meeting, LOPEZ-ONTIVEROS stated that if CS-1

needed more than 10 pounds of methamphetamine, with advance notice, he could request additional methamphetamine to be transported to San Diego.  AFF-1 ¶ 28.

Following additional recorded calls with LOPEZ-ONTIVEROS and RODRIGUEZ between January 21 and January 28, 2014, RODRIGUEZ met with CS-1 and delivered 1.78 kilograms of methamphetamine in exchange for $4,700. AFF-1 ¶¶ 29-34.

### d. May 8, 2014 controlled purchase with Lopez-Ontiveros and Oscar Ceja-Barajas for one pound of methamphetamine

On April 29, 2014, during a recorded meeting, Defendant LOPEZ-ONTIVEROS and Oscar CEJA-Barajas ("CEJA") met with CS-1 at a store in San Diego, California.  AFF-1 ¶ 28.  LOPEZ-ONTIVEROS told CS-1 that RODRIGUEZ was in Mexico and CEJA would deliver methamphetamine to CS-1 on LOPEZ-ONTIVEROS' behalf.  CEJA then gave CS-1 his cellular telephone number. LOPEZ-ONTIVEROS told CS-1 to call CEJA first and if CEJA didn't answer then to call LOPEZ-ONTIVEROS directly. When CS-1 asked LOPEZ-ONTIVEROS to confirm his new cellular number, LOPEZ-ONTIVEROS provided it and told CS-1 that he intended to change his cellular telephone number each month.  AFF-1 ¶ 35.

Between May 5 and May 7, 2014, CS-1 placed three recorded calls to CEJA regarding the purchase of one pound of methamphetamine. On the May 7, 2014

7

recorded call to CEJA, CS-1 asked if the pound of methamphetamine had arrived and CEJA said "yes."

On May 8, 2014, CS-1 placed a recorded call to CEJA to coordinate the purchase of the pound of methamphetamine. CEJA agreed to make the sale at a nearby auto parts store in San Diego, California. Shortly thereafter, during a recorded meeting, at the parking lot of the auto parts store, CS-1 entered CEJA's vehicle where CEJA sold CS-1 one pound of methamphetamine for $4,500.

### e.  Limitations in the Use of Confidential Sources

Investigators made use of CS-1 and CS-2 in order to purchase pound quantities of methamphetamine.  This was made possible by CS-1's personal friendship with LOPEZ-ONTIVEROS.  However, agents suspected that LOPEZ-ONTIVEROS deliberately compartmentalized his drug distribution activities by directing co-conspirators to complete drug transactions.  In addition, LOPEZ-ONTIVEROS would not meet with CS-2 to discuss further drug transactions. Investigators concluded that LOPEZ-ONTIVEROS would not be willing to identify his suppliers of multi-pound quantities of methamphetamine to CS-1 or any other CS. AFF-1 ¶¶ 82-84.

### 2. Undercover Agents

Prior to the first round of wiretaps, Agent Jacobsen reported that only CS-1 was capable of introducing an undercover agent to the LOPEZ-ONTIVEROS

8

DTO. However, given CS-1's lack of success in introducing CS-2 to LOPEZ-ONTIVEROS, it was not believed that an undercover agent would be able to meet anyone other than one of LOPEZ-ONTIVEROS' underlings.  AFF-1 ¶ 86.

### 3. Physical Surveillance/Pole Cams/GPS Mobile Trackers

In addition to the surveillance of controlled purchases of methamphetamine, the DEA conducted surveillance of Target Subjects LOPEZ-ONTIVEROS and M. ONTIVEROS, and others, and their residences at other times as part of the investigation.  The surveillance was aided by the use of GPS mobile trackers. AFF-1 ¶¶ 100-104.

Law enforcement officers conducted physical surveillance at LOPEZ-ONTIVEROS' primary residence in Bonita from October 18, 2013 through April 28, 2014 on nine separate occasions. AFF-1 ¶ 51.  In addition, physical surveillance of LOPEZ-ONTIVEROS was conducted away from his home on October 18, 2013, October 21, 2013 and March 13, 2014.  On these occasions, LOPEZ-ONTIRVEROS engaged in surveillance detection maneuvers such as suddenly speeding up and slowing down while looking around, making unexpected U-turns, and looking into parked vehicles near his Bonita residence. AFF-1 ¶¶ 55-57.

As to RODRIGUEZ, agents conducted physical surveillance at his National City residence on twelve occasions between November 21, 2013 and May 8, 2014,

including during the three controlled purchases of methamphetamine referenced above. AFF-1 ¶¶ 64-69.  Based upon mobile tracker information, law enforcement officers performed physical surveillance of RODRIGUEZ away from his residence and determined that he was alert to physical surveillance. AFF-1 ¶ 64. In addition, surveillance was conducted of RODRIGUEZ immediately prior to the delivery of methamphetamine to CS-1 in order to ascertain where the LOPEZ-ONTIVEROS DTO stored its drugs.  AFF-1 ¶ 65 -66.

Investigators sought but were unable to have a pole camera installed near the primary residences of LOPEZ-ONTIVEROS and RODRIGUEZ because they were denied permission by San Diego Gas & Electric. AFF-1 ¶¶ 52, 63.

Between March 11, and May 20, 2014, law enforcement officers also performed surveillance on five occasions at M. ONTIVEROS' residence on Z Street in San Diego that he listed on his California driver's license and that he provided to the SDPD as his primary address.  AFF-1 ¶ 74.

Previously, in 2009, investigators learned that M. ONTIVEROS was sensitive to law enforcement surveillance. During one such occasion, he recognized them and made an obscene gesture towards them, made an abrupt U-turn and followed officers.  AFF-1 ¶ 74.  Consequently, law enforcement officers decided to use physical surveillance on M. ONTIVEROS and his residence sparingly.  AFF-1 ¶ 75.

Finally, between March and April 2014, officers attempted to conduct surveillance on G. ONTIVEROS, AFF-1 ¶¶ 71-73, and CEJA, AFF-1 ¶¶ 76-77, with limited success.

### 4. Pen Registers/Toll Records

Toll records for the Target Subjects were obtained and analyzed in an attempt to determine who the Target Subjects were contacting and to link telephones with specific events in the investigation. AFF-1 ¶¶ 89-91.

After investigators suspected that LOPEZ-ONTIVEROS was no longer using TT-1, investigators conducted toll analysis of the telephone numbers previously contacted by LOPEZ-ONTIVEROS using TT-1 and compared them to telephone numbers contacted by TT-2. AFF-2 ¶¶ 53-56.  Thereafter, a mobile tracker was obtained on TT-2 and established probable cause that LOPEZ-ONTIVEROS was now using TT-2.  AFF-2 ¶¶ 43-45.

Prior to seeking wire interception of TT-3, investigators performed toll analysis on calls to and from TT-3 from April 29, 2014 through June 15, 2014. AFF-2 ¶¶ 57-59.

### 5. Administrative Subpoenas

Investigating agents issued and received responses to 179 administrative subpoenas for subscriber information and call detail records in order to identify individuals who associated with the Target Subjects. AFF-1 ¶ 80.

1   *6. Arrests*

2   No arrests were made prior to seeking wiretap interception of TT-1.

3   *7. Grand Jury Subpoenas/Interviews/Financial Investigation*

4   Given that no arrests had been made at the time of the second application for

5   wire interception, no attempts were made to interview members of the LOPEZ-

6   ONTIVEROS DTO.  The agents determined that interviews were unlikely to be

7   productive and would alert the DTO to the existence of a drug investigation. AFF-

8   1 ¶ 79.

9   Attempts to identify assets or currency related to the LOPEZ-ONTIVEROS

10   DTO were tried but were unsuccessful.  AFF-1 ¶ 96.

11   Investigators decided not to use the grand jury to further the investigation

12   in view of the lack of success in identifying assets associated with the DTO and the

13   likelihood that subpoenaing Target Subjects would compromise the investigation.

14   AFF-1 ¶ 79.

15   *8. Trash Searches*

16   Investigators considered trash searches but did not conduct any due to the

17   fact that it would be impossible to identify the trash of LOPEZ-ONTIVEROS since

18   he lived at a multi-family unit apartment complex and because M. ONTIVEROS

19   lived in a high crime/gang area which made trash searches potentially dangerous.

20   AFF-1 ¶¶ 93-94.

12

1    *9. Search Warrants*

2         As of the date of the initial wiretap order, agents reported that they only had

3    probable cause to search the residences of LOPEZ-ONTIVEROS, RODRIGUEZ

4    and CEJA.  However, the execution of search warrants would likely only produce

5    historical evidence of past drug distribution while disclosing the existence of the

6    investigation and likely hindering efforts to further investigate LOPEZ-

7    ONTIVEROS. AFF-1 ¶ 87.

8         *10. Internet Searches*

9         Internet searches on Facebook accounts were conducted for LOPEZ-

10   ONTIVEROS, M. ONTIVEROS, RODRIGUEZ and G. ONTIVEROS.  Due to

11   privacy settings which limited viewings of postings and photographs, the evidence

12   obtained was limited in furthering the goals of the investigation.

13   **D. Traditional Investigative Techniques Prior to Interception of TT-3**

14        In the June 23, 2014 affidavit in support of wire interception of TT-2 and

15   TT-3, Agent Jacobsen incorporated his prior Affidavit in Support of Application,

16   dated June 2, 2014, by reference.  AFF-2 ¶ 7.  With limited exceptions, the June

17   23, 2014 affidavit mirrors the June 2, 2014 affidavit as to the necessity to intercept

18   the calls of LOPEZ-ONTIVEROS on TT-2.

19        As noted above, some weeks after the TT-1 wiretap order was issued, law

20   enforcement officers learned that LOPEZ-ONTIVEROS had ceased using TT-1 on

13

May 25, 2014 before interception commenced.  Thereafter, on June 23, 2014,

agents sought a wiretap order on TT-2 and TT-3.  Agents had determined that TT-2

was the successor telephone for LOPEZ-ONTIVEROS after he dropped TT-1 and

that TT-3 was a telephone that M. ONTIVEROS was using to facilitate drug

transactions.

TT-3 is a telephone that investigators identified in April 2014 as being used

by M. ONTIVEROS in the course of supplying Henry Lee Hendrix, a

methamphetamine dealer, who was dealing methamphetamine to Confidential

Source 3 ("CS-3").  As to TT-3, the June 23, 2014 affidavit adds information tying

TT-3 to undercover drug transactions between CS-3 and Hendrix, and the results of

employing additional traditional law enforcement techniques.

*1. Confidential Sources*

In February 2014, CS-3, a paid informant with a felony criminal record,

provided information to investigators regarding Hendrix, a documented West

Coast Crip gang member and considered an "OG" (original gangster) within the

West Coast Crips. Between April 10, 2014 and May 27, 2014, CS-3 made two

separate purchases of methamphetamine from Hendrix.

**a.  April 10, 2014 Purchase of One Ounce of Methamphetamine from Henry Hendrix**

On April 10, 2014, at 10:15 a.m., CS-3 placed a consensually recorded

15cr575-GPC

phone call to Hendrix at 619-577-5375. Hendrix told CS-3 that he was at his residence (3986 Z Street, San Diego, California). CS-3 asked Hendrix if he was ready?  Hendrix told CS-3 "let me call my boy real quick."  According to TT-3 toll records, Hendrix placed an outgoing phone call from 619-577-5375 to TT-3 at 10:18 a.m.  At 10:21 a.m., Hendrix called CS-3 back and told CS-3 that he was ready and to come to Hendrix's residence.  At 10:50 a.m., CS-3 arrived at Hendrix's residence. During a recorded meeting between Hendrix and CS-3, Hendrix sold CS-3 one ounce of methamphetamine for $600 in front of Hendrix's residence.

According to TT-3 toll records, Hendrix placed an outgoing phone call from 619-577-5375 to TT-3 at 10:56 a.m. A few minutes later, agents observed Hendrix speak with a Hispanic male through the fence that connects Hendrix's residence and 3978 Z Street, San Diego, CA, an address that M. ONTIVEROS provided to the SDPD as his residence on August 20, 2013 and is listed on his California driver's license as his primary residence.

Based on the above recorded telephone calls between Hendrix and CS-3, physical surveillance, toll analysis of TT-3, and the recorded purchase of one ounce of methamphetamine from Hendrix, agents believed that Hendrix contacted M. ONTIVEROS over TT-3 to obtain the methamphetamine subsequently sold to CS-3.

15cr575-GPC

### b.  May 27, 2014 Purchase of Three Ounces of Methamphetamine from Hendrix

Around noon on May 26, 2014, CS-3 encountered Hendrix walking on 47th Street in San Diego, CA and provided Hendrix a ride to the gas station. On the way to the gas station, in an unrecorded conversation, CS-3 and Hendrix arranged for CS-3 to purchase narcotics. Hendrix told CS-3 to come by his house the next day and he would sell him three ounces of methamphetamine. According to TT-3 toll records, on May 26, 2014, at 10:34 p.m., TT-3 received an incoming telephone call from a telephone used by Hendrix (619-327-8852). TT-3 then sent a text message to 619-327-8852 at 10:38 p.m. TT-3 immediately placed a telephone call to TT-2 (telephone associated with LOPEZ-ONTIVEROS) at 10:39 p.m.

On May 27, 2014, at 3:18 p.m., CS-3 arrived at Hendrix's residence. A few minutes later, Hendrix arrived at the residence. Hendrix told CS-3 to "give my boy a minute" and Hendrix walked to the side of the house next to the M. ONTIVEROS' residence for several minutes. Hendrix told CS-3 to wait inside of his residence. While sitting inside of Hendrix's residence, CS-3 observed Hendrix leaning over the fence towards a Hispanic male. Hendrix walked inside of his residence and told CS-3 "give my boy a couple of more minutes." Hendrix returned to the side of the house and continued talking with the same Hispanic male. Hendrix returned to the residence and retrieved a clear plastic baggie of

15cr575-GPC

methamphetamine from his pocket. Hendrix told CS-3 "it should be good, my boy just weighed it." According to CS-3, the Hispanic male on the other side of the fence was previously introduced to him at a barbeque at the Hendrix Residence as Hendrix's "neighbor."

Based on the meeting between Hendrix and CS-3 on May 26, 2014, physical surveillance, toll analysis from TT-3, and the recorded purchase of three ounces of methamphetamine from Hendrix on May 27, 2014, agents believed that Hendrix contacted M. ONTIVEROS over TT-3 to obtain the methamphetamine subsequently sold to CS-3. AFF-1 ¶¶50-51.

Based on the toll analysis of TT-3, recorded methamphetamine purchases, the agent's training and experience and the current investigation, the agents believed that Defendant was utilizing both wire and electronic communication from TT-3, to contact Hendrix and Ford to facilitate the distribution of LOPEZ-ONTIVEROS DTO methamphetamine.

### c.  Limitations in the Use of Confidential Sources

The June 23, 2014 affidavit in support of interception of wire communications from TT-2 and TT-3 incorporates by reference the limitations in the use of CS-1 and CS-2.  AFF-2 ¶ 95.  In addition, in the June 23, 2014 affidavit, agents described the personal relationship between CS-3 and Hendrix which permitted CS-3 to purchase ounce quantities of methamphetamine.  However,

Hendrix had not identified his co-conspirators or locations of stash houses to CS-3. Handling agents concluded that it would be viewed with suspicion if CS-3 made inquiries about the location and identity of Hendrix's source of supply.  Finally, in view of the LOPEZ-ONTIVEROS DTO's association with the Mexican Mafia and the West Coast Crips, care was taken to avoid raising suspicions that CS-3 was an informant.  AFF 2 ¶¶ 99-100.

### 2. Undercover Agents

The June 23, 2014 affidavit reported that agents had been unable to introduce a undercover agent and incorporated by reference the usefulness and limitations of undercover agents set out at AFF-1 ¶ 86.  AFF-2 ¶ 101.

### 3. Physical Surveillance/Pole Cameras/GPS Mobile Trackers

The June 23, 2014 affidavit in support of wire interception of TT-2 and TT-3 relies on the surveillance referenced in the June 2, 2014 affidavit and adds surveillance activities at the home of LOPEZ-ONTIVEROS on June 16, 2014;  and surveillance of Henry Hendrix's residence on seven occasions between March 11 and May 27, 2014. AFF-2 ¶¶ 64, 90-91, 93-94.

In early June 2014, following the TT-1 wiretap order, investigators conducted toll analysis of the telephone numbers previously contacted by LOPEZ-ONTIVEROS using TT-1 and compared them to telephone numbers contacted by TT-2 and concluded that LOPEZ-ONTIVEROS was now using TT-2 after

18

dropping TT-1.  Thereafter, on June 11, 2014, a mobile tracker was obtained on TT-2, and on June 14, 2014, officers determined that LOPEZ-ONTIVEROS and TT-2 crossed into the United States at the Otay Mesa Port of Entry in a vehicle operated by Jennie Vallejo.  AFF-2 ¶¶ 43-45, 114.

A pole camera was installed near the home of M. ONTIVEROS on April 8, 2014 and was operational during the April 10 and May 27, 2014 drug transactions involving CS-3 and Hendrix.  Other than these dates, agents did not detect any other suspicious activities.  AFF-2 ¶ 117.

### 4. Pen Registers/Toll Records

Prior to seeking wire interception of TT-3, investigators performed toll analysis on calls to and from TT-3 from April 29, 2014 through June 15, 2014. AFF-2 ¶¶ 57-59.  In addition, after investigators suspected that LOPEZ-ONTIVEROS was no longer using TT-1, investigators conducted toll analysis of the telephone numbers previously contacted by LOPEZ-ONTIVEROS using TT-1 and compared them to telephone numbers contacted by TT-2. AFF-2 ¶¶ 53-56. Thereafter, a mobile tracker was obtained on TT-2 and established probable cause that LOPEZ-ONTIVEROS was now using TT-2.  AFF-2 ¶¶ 43-45.

### 5. Administrative and Grand Jury Subpoenas/Interviews/Financial

Further attempts to identify assets or currency related to the LOPEZ-ONTIVEROS DTO were tried but were unsuccessful.  AFF-2 ¶ 108. In the June

23, 2014 affidavit, Agent Jacobsen opined that interviews were unlikely to be productive in the investigation and would alert the DTO to the existence of a drug investigation. AFF-2 ¶¶ 97, 103.

### 6. *Search Warrants*

As of June 23, 2014, Agent Jacobsen reported that there was probable cause to search the residences of LOPEZ-ONTIVEROS, RODRIGUEZ, CEJA and Hendrix.  Agent Jacobsen continued to believe that execution of search warrants would likely only produce historical evidence of past drug distribution while disclosing the existence of the investigation and likely hindering efforts to further investigate LOPEZ-ONTIVEROS. AFF-2 ¶ 102.

### 7. *Trash Searches*

In addition to the prior concerns regarding trash searches, the June 23, 2014 affidavit also explained that trash searches at the Hendrix Residence was unlikely to further the investigation and was potentially dangerous.  AFF-2 ¶¶ 104-106.

### 8. *Arrests*

No arrests were made prior to the seeking wiretap interception on TT-2 and TT-3.

## DISCUSSION

## I.     Standard of Review

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18

U.S.C. §§ 2510–2520 (1982 & Supp. II 1984), permits law enforcement officials to engage in electronic surveillance if certain safeguards are observed.  To obtain a wiretap, a law enforcement official must apply to a judge for an order permitting the surveillance, 18 U.S.C. § 2518(1), and must overcome the statutory presumption against this intrusive investigative method by proving necessity. *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001); *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985).  One of those requirements provides that each application include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).  The issuing judge may conclude that the application satisfies the necessity requirement if he or she determines that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c); *see United States v. Christie*, 825 F.3d 1048, 1066 (9th Cir. 2016)**.** "Taken together, §§ 2518(1)(c) and (3)(c) require a showing of necessity before a district court can issue a wiretap order." *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988).

The Ninth Circuit has recently held that district courts are required to apply a two-step approach when considering a motion to suppress wiretap evidence. *United States v. Rodriguez*, ___ F.3d ___ , 2017 WL 971809 (9th Cir. March 14,

21

1   2017).  Under this approach, a reviewing district court judge reviews de novo

2   whether the application for a wiretap contains a full and complete statement as to

3   whether or not other investigative procedures have been tried and failed or why

4   they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

5   *Christie*, 825 F.3d at 1066 (*citing United States v. Rivera*, 527 F.3d 891, 898 (9th

6   Cir. 2008)). If the wiretap application meets these requirements of 18 U.S.C. §

7   2518(1)(c), then the district court judge reviews for "abuse of discretion the issuing

8   judge's conclusion that the wiretap was necessary." *Rivera*, 527 F.3d at 898 (*citing*

9   *Lynch*, 437 F.3d at 912).

10  **1. Whether the Affidavits Contain a Full and Compete Statement of Facts**

11          LOPEZ-ONTIVEROS argues that the Government failed to provide the

12  Court with a full and complete statement.  He relies on: (1) the affiant's statement

13  that he was providing only "facts that I believe are necessary" to establish a basis

14  for the order; (2) the failure to provide more detail about what information was

15  obtained from a federal wiretap investigation where Target Subject UM5176 had

16  been intercepted; and (3) reliance on boilerplate opinions regarding the necessity

17  averments.  Lopez-Ontiveros Mot. 9-10.

18          First, LOPEZ-ONTIVEROS argues that the application for TT-1 and TT-2

19  failed to make the required full and complete statement because, among other

20  things, Agent Jacobsen averred that:

22

1
2
3

> Since this Affidavit is being submitted for the limited purpose of securing authorization for the interception of wire communications, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the foundation for an order authorizing the interception of wire communications.

4
5

AFF-1 ¶ 7, AFF-2 ¶ 7. However, such a limitation does not operate to concede that

6

the affidavit fails to provide a "full and complete statement." *Cf. United States v.*

7

*Yeje-Cabrera*, 430 F.3d 1, 10 (1st Cir. 2005) (Acknowledgment that the affidavit

8

does not set forth all the facts gathered during the course of the investigation does

9

not, therefore, detract from an otherwise "full and complete statement" of the

10

failure, disutility, or danger from over investigative methods). The affiant's

11

representation that he has provided facts that are "necessary to establish the

12

foundation" for a wiretap order operates to claim compliance with the "full and

13

complete statement" requirement. Nonetheless, it is for this Court, *de novo*, to

14

make this inquiry.

15

Next, LOPEZ-ONTIVEROS claims that the Government did not include

16

much detail as to what information was derived from a May 1, 2014 federal

17

wiretap order where UM5176 was intercepted in calls with I. Rodriguez. AFF-1

18

reports that the target of the separate investigation, I. Rodriguez, had not been in

19

contact with LOPEZ-ONTIVEROS's phone (TT-1) or any of the telephone

20

numbers belonging to the Target Subjects. AFF-1 ¶ 110. In addition, UM5176

was identified as a drug purchaser who was being supplied by LOPEZ-

1  ONTIVEROS.  AFF-1 ¶ 17.  Given the lack of a nexus between the LOPEZ-

2  ONTIVEROS Target Subjects and I. Rodriguez, and UM5176's role as a purchaser

3  versus as a source of supply, the affiant concluded that the I. Rodriguez wiretaps

4  were insufficient to further the goals of the investigation of the LOPEZ-

5  ONTIVEROS DTO.  The Court agrees.

6      Finally, as to the conclusory or boilerplate language, federal courts,

7  including the Ninth Circuit, have read § 2518(1)(c)'s "full and complete statement"

8  requirement as protecting against "[a]n affidavit composed solely of conclusions

9  unsupported by particular facts." *United States v. Spagnuolo*, 549 F.2d 705, 710

10 (1977). The affidavit instead, "read in its entirety, must give a factual basis

11 sufficient to show that ordinary investigative procedures have failed or will fail in

12 the particular case at hand." *Id*. "The presence of conclusory language in the

13 affidavit will not negate a finding of necessity if the affidavit, as a whole, alleges

14 sufficient facts demonstrating necessity." *United States v. Torres*, 908 F.2d 1417,

15 1423 (9th Cir. 1990) (citing *United States v. Carneiro*, 861 F.2d 1171, 1177 (9th

16 Cir. 1988) (affidavit met necessity requirement even though it included conclusory

17 statement about difficulties in recruiting informants)).

18     Each affidavit includes information about the use, attempted use or decisions

19 not to use confidential sources, undercover officers, physical surveillance, pole

20 cameras, stationary surveillance, pen registers, toll analysis, grand jury subpoenas,

24

interviews, trash searches, search warrants, administrative subpoenas, financial investigations, internet searches, GPS tracking devices and previous wiretaps in the investigation of LOPEZ-ONTIVEROS and M. ONTIVEROS.  In addition, AFF-2 explained the developments in the case since the authorization of the first wiretap and the need for new wiretaps on phone numbers used by LOPEZ-ONTIVEROS and M. ONTIVEROS and was not an impermissible "duplicate" of the first. *Blackmon*, 273 F.3d at 1208.  It explained that investigators sought a wiretap on TT-2 because LOPEZ-ONTIVEROS had dropped TT-1, and TT-2 was identified as a successor line being used by him.  As to TT-3 used by M. ONTIVEROS, the affiant added the results of an undercover operation that led officers to conclude that M. ONTIVEROS was a source of supply for a gang member who made drug sales to CS-3.

The affidavits contain some boilerplate conclusions as to the effectiveness of certain techniques, particularly regarding grand jury subpoenas, search warrants, and interviews with associates and targets. For example, the first affidavit explains that "grand jury inquiries at this time might drive the Lopez DTO further underground, lead to destruction of evidence, or cause Target Subjects and/or their co-conspirators to flee the jurisdiction of the Court."  Some boilerplate language, however, is not fatal as we evaluate "'the level of detail in the affidavit *as a whole*,' rather than piecemeal." *Christie*, 825 F.3d at 1068 (quoting *Rivera*, 527

F.3d at 899) (emphasis in original).

Each affidavit includes information on why a particular technique would not be effective in this particular investigation. Both affidavits explain that the effectiveness of confidential sources, trash searches and interviews was limited due to the LOPEZ-ONTIVEROS DTO's association with the Mexican Mafia and the DTO's willingness to use violence.

In regard to undercover agents, both affidavits explain that given the inability to have CS-2 meet with LOPEZ-ONTIVEROS, investigators did not believe that it was likely that an undercover agent could be introduced to LOPEZ-ONTIVEROS.

With respect to stationary surveillance, both affidavits explained that pole cameras were installed near the residence of M. ONTIVEROS but that agents had not observed activities that were overtly indicative of drug distribution activities. In addition, Agent Jacobsen explained that the local utility company would not permit pole cameras to be installed near the homes of LOPEZ-ONTIVEROS and RODRIGUEZ.

M. ONTIVEROS argues that investigators did not adequately pursue physical surveillance. M. Ontiveros Mot. 29-31.  In support of his position, Defendant states that the seven attempts to conduct physical surveillance on M. Ontiveros' residence was insufficient because the affidavit did not specify the

26

1   length or the nature of the surveillance efforts. Ontiveros Mot. 14. He argues that if

2   only additional surveillance was conducted on him that the goals of the

3   investigation would have been satisfied. M. Ontiveros Mot. 29-31.

4        The Government argues that M. ONTIVEROS ignores the extensive

5   physical surveillance conducted on the other target subjects failed to meet the goals

6   of the investigation.  Furthermore, physical surveillance of some of the target

7   subjects had not only been proven unsuccessful, but had actually become

8   dangerous due to the counter surveillance techniques utilized by some of the target

9   subjects during the course of physical surveillance. *Cf. United States v. Rivera*, 527

10   F.3d 891, 903 n.2 (9th Cir. 2008) ([b]ecause the purpose of the wiretap was to

11   obtain evidence against the entire Rivera organization, we consider in our necessity

12   analysis all of the DEA's pre-wiretap investigative efforts directed at the Rivera

13   organization – not only those efforts directed at the users of the two telephones for

14   which the wiretap was sought.)  The Court finds that surveillance directed at the

15   Target Subjects, and specifically at M. ONTIVEROS, was conducted over a period

16   of months and that the affidavit provided numerous details regarding the successes

17   and failures of that surveillance. It was sufficient.

18        As to trash searches, both affidavits explain that trash searches could not be

19   conducted at the residence of LOPEZ-ONTIVEROS because he lived in an

20   apartment building, and law enforcement officers would be unable to determine

15cr575-GPC

1    which items of trash belong to the Target Subjects and which belong to the other

2    residents.  Meanwhile, M. ONTIVEROS lived in a high crime/gang area where

3    agents would risk physical injury by attempting to search his trash receptacles.

4         Both affidavits show that CS-1 was successful in arranging controlled buys

5    with LOPEZ-ONTIVEROS where his minions made the delivery of the drugs.

6    Both affidavits also explained that while CS-1 had achieved some success in

7    purchasing drugs, LOPEZ-ONTIVEROS had compartmentalized his drug

8    distribution activities and that it would be viewed with suspicion if CS-1 or CS-2

9    made inquiries into the location and identity of LOPEZ-ONTIVEROS' source of

10   supply.  *See Canales Gomez*, 358 F.3d at 1226 (quoting *United States v. Bernal-*

11   *Obseo*, 989 F.2d 331, 333 (9th Cir. 1993) ("[T]he use of informants to investigate

12   and prosecute persons engaged in clandestine criminal activity is fraught with

13   peril.")).

14        M. ONTIVEROS contends that investigators did not adequately utilize CS-3

15   or undercover agents during the investigation as it related to Defendant. Defendant

16   asserts that the Government's reasons for the unlikely success of CS-3 are hollow

17   because CS-3 did not ask Hendrix who his source of supply was. M. Ontiveros

18   Mot. 27.  The second affidavit showed some success in connecting M.

19   ONTIVEROS to controlled buys by CS-3 of ounce quantities of methamphetamine

20   from Target Subject Hendrix.  However Hendrix had not identified his source of

28

1   supply or location of stash houses and investigators concluded that it would have

2   been suspicious for CS-3 to inquire about them.  These explanations explained "in

3   reasonable detail why each confidential source . . . was unable or unlikely to

4   succeed in achieving the goals of the [particular] investigation." *See Rivera*, 527

5   F.3d at 899. The Court finds that they are sufficient and reasonable.

6        Defendant lastly argues that investigators could have utilized

7   witness/suspect interviews, but failed to employ the investigative technique and

8   therefore the affidavit failed to demonstrate necessity. M. Ontiveros Mot. 32.  In

9   support of this position, Defendant argues that agents could have interviewed

10   Hendrix without exposing the investigation to the other target subjects M.

11   Ontiveros Mot. 32.  Ultimately, the law does not require investigating officers to

12   "exhaust every conceivable alternative before obtaining a wiretap." *Christie*, 825

13   F.3d at 1068 (citing *Rivera*, 527 F.3d at 903). The affidavit need only explain why

14   a particular investigative procedure reasonably appears "unlikely to succeed." 18

15   U.S.C. § 2518(1)(c).

16        Based on a de novo review of both affidavits, the Court concludes that they

17   adequately explained why the interception of wire communications was necessary

18   to investigate this conspiracy and the target subjects, and that they contained a full

19   and complete statement of facts to establish necessity under 18 U.S.C. §

20   2518(1)(c). *See United States v. Canales Gomez*, 358 F.3d 1221, 1225 (9th Cir.

2004). [1]

## 2. Whether the Wiretaps Were Necessary

If the wiretap application meets the requirements of 18 U.S.C. § 2518(1)(c), the Court then reviews for an abuse of discretion the issuing judge's decision to issue the wiretap order after finding that the wiretap was necessary in the circumstances. *Canales Gomez*, 358 F.3d at 1225. The Court reviews each wiretap independently. *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1115 (9th Cir. 2005).

In evaluating necessity, the Ninth Circuit employs "a 'common sense approach' to evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success." *Christie*, 825 F.3d at 1068 (quoting *Gonzalez, Inc.*, 412 F.3d at 1112).

This Court must accord the issuing judge "considerable discretion in finding necessity, particularly when the case involves the investigation of a conspiracy," *Reed*, 575 F.3d at 909, so the Court's standard of review is deferential, *McGuire*, 307 F.3d at 1197. In this case, the Jacobsen affidavit submitted on June 2, 2014 in

---

[1] LOPEZ-ONTIVEROS challenges the wiretap orders for TT-5, TT-6 and TT-8 based upon their reliance on AFF-1 and information derived from the use of CS-1.  Lopez-Ontiveros Mot. at 2. M. ONTIVEROS also challenges all of the wiretaps following the TT-3 order on a "fruit of the poisonous tree" theory.  M. Ontiveros Mot. 34-43. To the extent that the Court finds that AFF-1 and AFF-3 satisfy the requirements of 18 U.S.C. §§ 2518(1)(c) and 3(c), the Court finds the arguments lacks merit.

30

1  support of wire interception of TT-1 reported that an eight-month investigation into

2  LOPEZ-ONTIVEROS and his associates had been conducted and that the

3  government used a range of traditional techniques including confidential sources,

4  pen registers, physical surveillance, pole cameras, internet searches, and GPS

5  mobile trackers, before seeking authorization for electronic surveillance. The

6  affidavits also explain why other techniques such as search warrants, undercover

7  agents, trash searches, and interviews with witnesses would be unproductive or

8  dangerous given specific facts about the Mexican Mafia and the West Coast Crips,

9  and the use of violence by the LOPEZ-ONTIVEROS DTO.

10      The June 23rd affidavit described how LOPEZ-ONTIVEROS followed his

11  practice of discarding telephones by discontinuing the use of TT-1, and the follow

12  up by law enforcement officers to identify his successor line.  AFF-2 also provided

13  the details regarding the undercover drug buys from Hendrix by CS-3 which

14  demonstrated that TT-3 was used to facilitate a drug crime and gave an update as

15  to other investigative techniques that had been used since the original wiretap.

16      Relying on *Gonzalez, Inc*., M. ONTIVEROS argues that the Government

17  failed to demonstrate necessity because it failed to establish necessity individually

18  as to M. ONTIVEROS. ECF No. 257 at 4-5.  However, this case is distinguishable

19  from *Gonzalez, Inc*., where the Ninth Circuit held that the government had failed to

20  demonstrate necessity for a wiretap on the telephone of the main office of a bus

15cr575-GPC

company that the government suspected was being used in an alien smuggling ring. In that case, the government had already conducted a multi-year investigation into the alleged alien smuggling activities but then sought to intercept incriminating evidence linking the company's founder and other persons in the company's main office to those alien-smuggling activities. 412 F.3d at 1106–07. The affidavit supporting the wiretap application demonstrated that the government had conducted only limited investigation into the activities at the company's main office before applying for a wiretap. *Id*. at 1108. In fact, the affidavit demonstrated that the government had conducted only five-days of pen register and trap-and-trace analysis of the office's telephone and had conducted only limited physical surveillance of the office before abandoning its surveillance efforts. *Id*. at 1112. The Ninth Circuit concluded that the affidavit indicated that "the government side-stepped its responsibility to use promising traditional techniques when it began to investigate the [company's] office, and instead conducted only the most cursory investigation before seeking a wiretap." *Id*. at 1113–14.

Here, M. ONTIVEROS was named as a Target Subject in the original application for a wiretap on TT-1, and an investigation into M. ONTIVEROS had been underway for more than two-months at the time the wiretap on TT-3 was obtained.  Surveillance had been performed at M. ONTIVEROS' residence in January 2014 when co-conspirator RODRIGUEZ was surveilled at M.

32

ONTIVEROS' residence immediately before 1.78 kilograms of methamphetamine were delivered by RODRIGUEZ to CS-1.  In addition, a pole camera was installed near M. ONTIVEROS' residence and an undercover operation was directed at one of his drug customers two months before the TT-3 wiretap was approved.  Unlike *Gonzalez, Inc.*, the Government was not trying to piggy-back its application for a wiretap on TT-3 on the earlier investigation of LOPEZ-ONTIVEROS.

In this case, law enforcement officers specifically sought to gain evidence and knowledge of how the LOPEZ-ONTIVEROS DTO was operating their drug trafficking business, including identifying the sources of supply, locations of stash houses and identifying other co-conspirators.  An eight-month investigation had not succeeded in allowing law enforcement officers to achieve these goals.  After reviewing the factual statements in the affidavits, which include the purpose of the investigation and the information sought, the Court cannot say that the issuing judges abused their discretion in finding necessity in the circumstances presented here.

**3. Whether Probable Cause Supported the TT-3 Wiretap**

M. ONTIVEROS challenges the finding of probable cause for TT-3.  A wiretap order should only be issued where the government can demonstrate: (1) probable cause that an individual has committed, is committing, or will commit an enumerated offense; (2) probable cause that communications regarding that offense

33

1   will be intercepted; and (3) that ordinary investigative techniques have been or will

2   be unsuccessful. 18 U.S.C § 2518(3)(a)-(c).

3         Under the Fourth Amendment, probable cause exists where the issuing judge

4   can determine that there is a "fair probability" that the evidence sought will be

5   found in the place searched. *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (the task of

6   the issuing magistrate is simply to make a practical, common-sense decision

7   whether, given all the circumstances set forth in the affidavit before him there is a

8   fair probability that contraband or evidence of a crime will be found in a particular

9   place). In the wiretap context, the government is not required to establish probable

10   cause as to each individual the wiretap might intercept. *See United States v. Reed*,

11   575 F.3d 900, 911 (9th Cir. 2009) (quoting *United States v. Nunez*, 877 F.2d 1470,

12   1473 n.1) ("[T]he government ha[s] no duty to establish probable cause as to each

13   interceptee. It is sufficient that there was probable cause to tap the phone.")

14   (alterations in original). Rather, "[a]uthorization for a wiretap is based on probable

15   cause to believe the telephone is being used to facilitate the commission of a

16   crime…." *Id. See also United States v. Martin*, 599 F.2d 880, 884-85 (9th Cir.

17   1979), *overruled on other grounds*, *United States v. DeBright*, 730 F.2d 1255,

18   1258 (9th Cir. 1984) (en banc) (It is sufficient that the applicant establishes

19   probable cause as to any individual named in the application; the applicant can

20   then name others who are expected to converse on the tapped line, even though

1    probable cause as to them ultimately may not be found).

2         In this case, the DEA identified TT-3 as being used during the course of a

3    controlled purchase of methamphetamine by CS-3 from Hendrix. A combination of

4    undercover recorded calls and toll records for TT-3 showed that Hendrix called

5    TT-3 immediately after informing CS-3 that he was going to call "his boy" in order

6    to obtain the drugs for sale. This evidence established probable cause to believe

7    that Hendrix was engaged in drug trafficking and that he was being supplied by the

8    individual who was using TT-3 to traffic drugs and that TT-3 was being used "in

9    connection with the commission" of drug trafficking offenses.

10        M. ONTIVEROS challenges the conclusion that he was the user of the TT-3

11   and asserts that the claim was based on stale information. First, § 2518(3) permits

12   interception of a telephone "being used, or about to be used, in connection with the

13   commission" of the predicate offense. Here, there was probable cause to believe

14   that TT-3 was being used in this way.  In addition, there was probable cause to

15   believe that ONTIVEROS was using TT-3.  The government reported that TT-3

16   was activated on June 11, 2013 and the subscriber information remained the same

17   after this activation. Further, on August 20, 2013, Defendant reportedly gave TT-3

18   as his telephone number to the San Diego Police Department during an unrelated

19   investigation involving a family member. Based on the subscriber information,

20   Defendant providing the telephone number as his number to SDPD and toll

35

analysis, there was probable cause to believe that M. ONTIVEROS continued to be the user of TT-3.

On these facts, the district court did not err in finding that there was probable cause that a wiretap on TT-3 would reveal evidence of the crimes under investigation.

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Suppress Wiretap Evidence, ECF Nos. 209 and 231, are hereby **DENIED**.

**IT IS SO ORDERED.**

Dated:  March 17, 2017

Hon. Gonzalo P. Curiel
United States District Judge

15cr575-GPC